IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

```
                                  :
COLOSSUS MEDIA, LLC
                                  :

    v.                            :  Civil Action No. DKC 24-1402

                                  :
ADALYTICS RESEARCH, LLC
                                  :
```

**MEMORANDUM OPINION**

Presently pending and ready for resolution in this false advertising and defamation case brought by Plaintiff Colossus Media, LLC ("Colossus" or "Plaintiff") against Defendant Adalytics Research, LLC ("Adalytics" or "Defendant") is the motion to dismiss filed by Defendant. (ECF No. 19). The issues have been briefed, and the court now rules, no hearing being deemed necessary. Local Rule 105.6. For the following reasons, the motion to dismiss will be denied.

**I.   Background**[1]

Plaintiff "is a sell-side platform ("SSP") that provides advertisers of all sizes a programmatic advertising platform that automates the sale of ad[vertisement ("ad")] inventory between advertisers and agencies leveraging proprietary technology." (ECF

---

[1] The following facts are set forth in the amended complaint and construed in the light most favorable to Plaintiff.

No. 9 ¶ 1). Plaintiff's parent company is Direct Digital Holdings, Inc. ("DRCT"). (ECF No. 9 ¶ 1).

"Publishers auction advertising space on their websites through SSPs like Colossus SSP. Large brands and other advertisers buy advertising space through DSPs [demand side platforms]." (ECF No. 9 ¶ 11). Plaintiff "transacts with DSPs to deliver ad inventory to target audiences. Advertisers want to ensure that their ads are going to their respective target audiences. To ensure that ads are served to the buyer's target audience, SSPs and DSPs use cookie-based user IDs to identify, track, and categorize consumers."[2] (ECF No. 9 ¶ 12).

Plaintiff alleges that this process happens "extremely quickly-in less than half a second-and on a massive scale." (ECF

---

[2] Plaintiff provides the following example to illustrate this technical process:

> Person A visits ESPN's website on his laptop. Person A is associated with a sports audience segment, and the internet browser declares a user ID for Person A that is sent to an SSP. The advertising space on the ESPN webpage that Person A is viewing is effectively for auction or sale, and the SSP sends a request for bids on that ad space to a DSP. To send the bid request, the SSP matches Person A's user cookie ID with a DSP user ID within the parameters of the DSP's targeted sports audience segment. Based on the match between the SSP user ID and the corresponding DSP user ID within the targeted sports segment, the DSP then bids on the ad space on behalf of the brand. The brand's ad then appears on the ESPN website that Person A is viewing.

(ECF No. 9 ¶ 12).

No. 9 ¶ 13).  Plaintiff transacts with several DSPs, some directly and others indirectly.  (ECF No. 9 ¶ 14).  The majority of Plaintiff's "business comes from transactions with DSPs that Colossus SSP sends through . . . [a company called] BidSwitch, an intermediary that helps connect SSPs with DSPs."  (ECF No. 9 ¶ 14).  When Plaintiff used an intermediary such as BidSwitch, "there is an additional layer of ID matching."  (ECF No. 9 ¶ 14).

One of the DSPs Plaintiff transacts with through BidSwitch is a DSP called The Trade Desk ("Trade Desk").  (ECF No. 9 ¶ 14).  Plaintiff describes this process as follows:

> [W]hen Person A visits the ESPN website, and the browser-declared user cookie ID for Person A is associated with a sports segment and sent to Colossus SSP, instead of matching Person A's user cookie ID with a DSP user ID such as a Trade Desk ID ("TDID"), Colossus SSP matches the user cookie ID with a BidSwitch ID. BidSwitch then matches the BidSwitch user ID with a user ID on the DSP side. This matched user ID on the DSP side may or may not be a TDID depending on which DSPs BidSwitch decides to send the bid request to. Colossus SSP has no control or knowledge of the DSPs to which BidSwitch sends a particular bid request, the DSP user IDs, or the value of any particular DSP user ID.

(ECF No. 9 ¶ 14).

Plaintiff alleges that Defendant "is a for-profit company that purports to conduct advertising analytics to serve brands and advertisement buyers."  (ECF No. 9 ¶ 16).  "Adalytics provides so-called analysis on digital advertising performance and advertising technology vendors, publishers, and campaigns that improperly serve advertisements.  Advertisement buyers pay Adalytics for

information on ad technology vendors and publishers that improperly serve their advertisements." (ECF No. 9 ¶ 17). Plaintiff alleges that Defendant "acknowledges that its posts are generated to advertise its services, stating: 'Like many other companies, we release thought leadership on systemic issues affecting brands and their media investments . . . to . . . attract new clientele.'" (ECF No. 9 ¶ 18).

Plaintiff further alleges that "Adalytics' business thrives on creating distrust between advertiser buyers and advertising technology vendors and products. Adalytics is known for publishing inflammatory blog posts regarding advertising technology vendors and products for the purpose of winning new advertiser customers." (ECF No. 9 ¶ 19).

In May 2024, several reporters reached out to Plaintiff about an advance copy of a blog post about Plaintiff the reporters received from Defendant. (ECF No. 9 ¶ 20). "Based on the limited information that the reporters provided to Colossus SSP about the post, Colossus SSP knew that Adalytics' post contained false and inaccurate information about Colossus SSP." (ECF No. 9 ¶ 20).

Plaintiff contends that Plaintiff and its parent company reached out to Defendant on May 8 and May 9, 2024, to tell Defendant that its post "contained false and inaccurate statements." (ECF No. 9 ¶ 21). Plaintiff and its parent company asked for a copy of the post to allow Plaintiff to give Defendant information to

4

correct these false statements. (ECF No. 9 ¶ 21). Plaintiff and its parent company also notified Defendant "that they were prepared to provide all the facts and information establishing Adalytics' post was false." (ECF No. 9 ¶ 21). Plaintiff alleges that Defendant refused to provide Plaintiff with a copy of the post prior to publishing it, and Defendant also refused to speak with Plaintiff before Defendant published the post. (ECF No. 9 ¶ 22).

On May 10, 2024, Defendant published the blog post: "Are user IDs declared consistently in ad auctions?" on its website. (ECF No. 9 ¶ 23). Plaintiff contends that "[t]he post makes false and misleading statements about Colossus SSP and its business to instill distrust of Colossus SSP and other ad technology products among ad buyers and other ad technology vendors for the purpose of winning new business from ad buyers." (ECF No. 9 ¶ 23). Plaintiff alleges that "[t]he post portrayed Colossus SSP as mis-declaring user IDs in its bid requests for the purpose of selling ad space at higher prices to ad buyers seeking to serve advertisements to a targeted audience." (ECF No. 9 ¶ 24). Specifically, Plaintiff alleges that:

> [i]n the post, Adalytics purported to analyze and compare advertisements and bid responses on the Trade Desk DSP through 16 different SSPs, including Colossus SSP, in order to match the TDID declared by the SSP in its bid request and the actual cookie TDID stored in the user's browser. The post concluded that Colossus SSP is the only SSP for which there were consistent misdeclarations of user IDs—that is, the TDID declared by Colossus SSP in its bid request did not match the

> user's actual cookie TDID. The post further concluded
> that for the other fifteen SSPs, the TDID declared by
> the SSP "always perfectly" matched the user's actual
> cookie TDID.

(ECF No. 9 ¶ 25).

Plaintiff contends that these statements "are false and misleading" because Plaintiff "does not mis-declare or otherwise manipulate or alter user IDs in its bid requests." (ECF No. 9 ¶ 26). Plaintiff alleges that "it is not possible for Colossus SSP to mis-declare a user's TDID because Colossus SSP connects to Trade Desk through BidSwitch and has no control or knowledge of whether BidSwitch sends a particular bid request to Trade Desk or another DSP." (ECF No. 9 ¶ 26). Further, "[e]ven if BidSwitch sends a bid request to Trade Desk, Colossus SSP has no knowledge of the TDIDs or the values associated with those TDIDs." (ECF No. 9 ¶ 26).

Although Defendant's post acknowledged that Plaintiff "connected to Trade Desk through BidSwitch," the post "concluded that the mis-declared user TDIDs in Colossus SSP's bid requests were unrelated to BidSwitch." Additionally, the amended complaint alleges that the post falsely found that for the other fifteen SSPs that transact with Trade Desk that Defendant studied,

> the TDID declared by the SSP in its bid response 'always
> perfectly' matched the TDID in the user's browser. The
> post further stated that there were no technical
> explanations for the mis-declared user IDs in Colossus
> SSP bid requests, furthering the post's false,

defamatory, and disparaging conclusion that Colossus SSP
mis-declared user TDIDs.

(ECF No. 9 ¶ 27).  Additionally, Plaintiff alleges that "[t]he
post falsely defines Colossus SSP's activity as 'Sophisticated
Invalid Traffic' or '[c]ookie stuffing, recycling or harvesting
(inserting, deleting or misattributing cookies thereby
manipulating or falsifying prior activity of users).'" (ECF No.
9 ¶ 32).

Plaintiff contends that "there were discrepancies between the
TDID sent in the bid response and the TDID in the user's browser
for transactions between Trade Desk and other SSPs that connect to
Trade Desk through an intermediary." (ECF No. 9 ¶ 28).  Plaintiff
alleges upon information and belief Defendant "doctored" a
screenshot in its post to illustrate a lack of discrepancies for
a different SSP.  (ECF No. 9 ¶¶ 29-30).

Plaintiff alleges upon information and belief that Defendant
"actively worked to amplify these false statements in the
marketplace in an attempt to destroy Colossus SSP's business and
reputation." (ECF No. 9 ¶ 31).  Plaintiff alleges that Defendant
acted with knowledge because "[a]s a company that claims expertise
in advertising technology and programmatic advertising, Adalytics
would be well aware that Colossus SSP, because its transactions
occur within fractions of a second and go through an intermediary,

7

could not systematically 'fake' TDIDs to generate more revenue, as the Adalytics post states and/or implies." (ECF No. 9 ¶ 33).

Plaintiff contends that Defendant acted with malice by distributing the post to the media without asking Plaintiff for an explanation. (ECF No. 9 ¶ 35). Plaintiff alleges that this demonstrated that Defendant's "only goal was to spark demand for its 'ad transparency' services by creating a media firestorm" about Plaintiff. (ECF No. 9 ¶ 35).

Several media outlets published articles based on Defendant's post. Plaintiff contends that the "articles further demonstrate the defamatory meaning of the Adalytics post: that Colossus SSP misdeclared user IDs in its bid requests for the purpose of increasing its sales." (ECF No. 9 ¶ 36).

Plaintiff alleges that Defendant's post "has caused massive harm to Colossus SSP's business and reputation and threatens its very existence." (ECF No. 9 ¶ 42). Plaintiff alleges that on or about May 8 or 9, 2024, after Defendant shared an advanced copy of the post with the media, "on May 9, 2024, Trade Desk suspended business with Colossus SSP because of the post's claims that Colossus SSP misrepresented user IDs in its bid requests." (ECF No. 9 ¶ 43). Additionally, several hours after Defendant published the post on May 10, 2024, BidSwitch suspended Plaintiff from its platform because of the claims in Defendant's post. This caused Plaintiff "significant financial harm" because "the majority of

Colossus SSP's revenue . . . comes from transactions through BidSwitch." (ECF No. 9 ¶ 44).   Lastly, Plaintiff alleges that in addition to the financial harm, Defendant's post has damaged Plaintiff's "reputation and goodwill by accusing Colossus SSP of engaging in fraudulent activity and impeaching Colossus SSP's honesty, integrity, and core business." (ECF No. 9 ¶ 45).

Plaintiff filed a complaint against Defendant on May 14, 2024 for violations of 15 U.S.C. § 1125 ("the Lanham Act"), as well as defamation and injurious falsehood under Maryland law. (ECF No. 1). On June 3, 2024, Plaintiff filed an amended complaint. (ECF No. 9). Plaintiff asserts federal question jurisdiction and supplemental jurisdiction over the state law claims, and Plaintiff also asserts diversity jurisdiction. On July 3, 2024, Defendant filed a motion to dismiss the amended complaint. (ECF No. 19). On July 31, 2024, Plaintiff filed a response in opposition to Defendant's motion to dismiss. (ECF No. 22). On August 14, 2024, Defendant filed a reply in support of its motion to dismiss. (ECF No. 23).

## II. Standard of Review

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the sufficiency of the complaint. *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006). "[T]he district court must accept as true all well-pleaded allegations and draw all reasonable factual inferences in plaintiff's favor."

*Mays v. Sprinkle*, 992 F.3d 295, 299 (4th Cir. 2021).   A plaintiff's complaint needs only satisfy the standard of Rule 8(a)(2), which requires a "short and plain statement of the claim showing that the pleader is entitled to relief."   "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'"   *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (quoting Fed.R.Civ.P. 8(a)(2)).   A Rule 8(a)(2) "showing" requires "stat[ing] a claim to relief that is plausible on its face."   *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).   "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that defendant is liable for the misconduct alleged."   *Mays*, 992 F.3d at 299-300 (quoting *Iqbal*, 556 U.S. at 663).   Legal conclusions couched as factual allegations are insufficient, *Iqbal*, 556 U.S. at 678, as are conclusory factual allegations devoid of any reference to actual events, *United Black Firefighters of Norfolk v. Hirst*, 604 F.2d 844, 847 (4th Cir. 1979).

## III. Analysis

Plaintiff's amended complaint has three counts: federal false advertising and unfair competition under the Lanham Act (Count I), defamation (Count II), and injurious falsehood (Count III).   (ECF No. 9).   In its motion to dismiss, Defendant argues that Plaintiff

has failed to state a claim for each of these counts. (ECF No. 19).

**A. Exhibits**

Defendant attaches several exhibits to its motion to dismiss: the blog post, email correspondence between Plaintiff and Defendant, and an article written based on Defendant's post. (ECF Nos. 19-2; 19-3; 19-4). Defendant argues that the court should consider the exhibits when resolving the motion to dismiss[3] because all three exhibits are "integral to the complaint," and "there can be no dispute" as to the post's authenticity, the correspondence is authentic, and "there can be no dispute" as to the authenticity of the article. (ECF No. 19-1, at 7 n.1, 8 n.2, 15 n.5).

Plaintiff argues that the court should not consider the exhibits. Plaintiff contends that while the blog post is integral to its complaint, there is a dispute regarding the authenticity of the version presented by Defendant. Plaintiff alleges that the

---

[3] In the alternative, Defendant argues that the court should treat the motion to dismiss as a motion for summary judgment. (ECF No. 23, at 19). Under Fed. R. Civ. P. 12(d), a court may convert a motion to dismiss into a motion for summary judgment and consider outside documents. "The court should not make such a conversion where the parties are not given notice and are not afforded the opportunity to conduct reasonable discovery." *Aegis Bus. Credit, LLC v. Brigade Holdings, Inc.*, No. 8:21-CV-00668-AAQ, 2022 WL 3716543, at *5 (D.Md. Aug. 29, 2022) (citing *Carter v. Baltimore Cty., Maryland*, 39 Fed.Appx. 930, 932-33 (4th Cir. 2002)). Defendant raises this argument in its Reply. Accordingly, Plaintiff has not been given adequate notice, and the court will not convert the motion to dismiss into a motion for summary judgment.

version attached to the complaint is just one version of several versions that Defendant provided to third parties. (ECF No. 22, at 27-28). Additionally, Plaintiff argues that the correspondence and article are not integral to the complaint, and Plaintiff disputes the authenticity of the correspondence because it "contains several redactions and is incomplete." (ECF No. 22, at 27).

"As a general rule, the court does not consider extrinsic evidence at the motion to dismiss stage[.]" *Faulkenberry v. U.S. Dep't of Def.*, 670 F.Supp.3d 234, 249 (D.Md. 2023) (quoting *Reamer v. State Auto. Mut. Ins. Co.*, 556 F.Supp.3d 544, 549 (D.Md. 2021), *aff'd*, No. 21-2432, 2022 WL 17985700 (4th Cir. Dec. 29, 2022)). "However, 'the court may consider, without converting the motion to dismiss into one for summary judgment, documents attached to the complaint as exhibits, and documents attached to a motion to dismiss if the document is integral to the complaint and there is no dispute about the document's authenticity.'" *Faulkenberry*, 670 F.Supp.3d at 249 (quoting *Reamer*, 556 F.Supp.3d at 549). "A document is integral to the complaint if its very existence, and not the mere information it contains, gives rise to the legal rights asserted." *Faulkenberry*, 670 F.Supp.3d at 249 (quoting *Reamer*, 556 F.Supp.3d at 549) (internal quotation marks omitted).

As discussed above, there is a dispute regarding the authenticity of the post and the correspondence, and the article

12

is not integral to the complaint.  Therefore, at the motion to
dismiss stage, the court will not consider the documents outside
of the complaint.

## B. Count I: Lanham Act False Advertising and Unfair Competition

Plaintiff alleges that Defendant violated the Lanham Act by
making "false and misleading statements in commercial advertising
and promotion." (ECF No. 9 ¶ 47).  Further, Plaintiff alleges
that these statements "were made in an effort to damage Colossus
SSP's business and reputation for the purpose of selling Adalytics'
services and winning new business from ad buyers." (ECF No. 9 ¶
48).  Plaintiff alleges that the "statements are false and
misleading descriptions of fact that have or are likely to cause
confusion, mistake, or deception and misrepresented the nature,
characteristics, and qualities of Colossus SSP's business and the
services that it offers." (ECF No. 9 ¶ 49).  Plaintiff contends
that the "statements have materially influenced, or are likely to
materially influence, purchasing decisions because publishers, ad
buyers, and ad technology vendors are misled to incorrectly believe
that Colossus SSP is disreputable, is untrustworthy, and employs
fraudulent business practices when it does not." (ECF No. 9 ¶
50).  Lastly, Plaintiff alleges that the false statements "have
caused and will continue to cause the loss of goodwill and the
loss of current and prospective customers and industry partners."
(ECF No. 9 ¶ 52).

Defendant argues that Plaintiff has failed to state a claim under the Lanham Act because the blog post is not commercial speech required for commercial advertising or promotion under the Lanham Act, Plaintiff did not adequately allege that the post proximately caused its damages, and Plaintiff failed to identify any false or misleading description of fact. (ECF No. 19-1, at 7-15).

In relevant part, the Lanham Act provides that:

(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which--
    . . . .
    (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a).

The United States Court of Appeals for the Fourth Circuit has held that:

[A] plaintiff asserting a false advertising claim under the Lanham Act must establish that:

(1) the defendant made a false or misleading description of fact or representation of fact in a commercial advertisement about his own or another's product; (2) the misrepresentation is material, in that it is likely to influence the purchasing decision; (3) the misrepresentation actually deceives or has the tendency to deceive a

14

> substantial segment of its audience; (4) the
> defendant placed the false or misleading statement
> in interstate commerce; and (5) the plaintiff has
> been or is likely to be injured as a result of the
> misrepresentation, either by direct diversion of
> sales or by a lessening of goodwill associated with
> its products.

*Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 272 (4th Cir. 2002) (citations omitted). The parties dispute whether Plaintiff has alleged the first and fifth elements.

### 1. Commercial Advertisement

"The Lanham Act does not define 'commercial advertising or promotion.' And neither the Supreme Court nor [the Fourth Circuit] has determined how to assess whether a communicative message is commercial advertising or promotion." *Handsome Brook Farm, LLC v. Humane Farm Animal Care, Inc.*, 700 F.App'x 251, 256 (4th Cir. 2017), cited approvingly in *De Simone v. VSL Pharmaceuticals, Inc.*, 36 F.4th 518, 532 (4th Cir. 2022). In *Handsome Brook Farm*, the court cited to multiple other circuit courts that adopted all four factors defining commercial advertisement set out in *Gordon & Breach Science Publishers v. Am. Institute of Physics*, 859 F.Supp. 1521, 1536 (S.D.N.Y. 1994). *Handsome Brook Farm*, 700 F.App'x at 256. The *Handsome Brook Farm* panel ultimately agreed with the Sixth Circuit and adopted three of the four factors, stating that commercial advertisement under the Lanham Act is (1) "commercial speech" (2) "for the purpose of influencing consumers to buy goods or services" and "while the representation need not be a classic

advertising campaign, but may include more informal types of promotion, the representations [(3)] must be sufficiently disseminated to the relevant purchasing public to constitute advertising or promotion within that industry." *Handsome Brook Farm*, 700 F.App'x at 256 (first quoting *Gordon & Breach Sci. Publishers*, 859 F.Supp. at 1536); and then citing *Grubbs v. Sheakley Grp., Inc.*, 807 F.3d 785, 800-01 (6th Cir. 2015)).

While *Handsome Brook Farm* is an unpublished opinion, the Fourth Circuit cited *Handsome Brook Farm* in a later published opinion, *De Simone v. VSL Pharmaceuticals, Inc.*, 36 F.4th 518, 532 (4th Cir. 2022), and set out a summary of the test from *Handsome Brook Farm.* The Fourth Circuit stated that "[u]nder the Lanham Act, 'commercial advertising or promotion' is 'commercial speech . . . for the purpose of influencing consumers to buy goods or services.'" *De Simone*, 36 F.4th at 532 (quoting *Handsome Brook Farm*, 700 F.App'x at 256).

The panel in *Handsome Brook Farm* stated:

> Neither our precedent, nor the Supreme Court, has issued any determinative standard by which to assess if a message is commercial speech. The Supreme Court has highlighted a handful of considerations, and our own cases have been similarly context-specific. These factors are all illustrative, but none are determinative. A message may bear many of these qualities yet not be commercial speech; and a message may lack some of these qualities yet still be commercial speech. The Supreme Court has identified three qualities of commercial speech: whether the message is economically motivated, promotes a specific product, and is an advertisement. *Bolger v. Youngs Drug Prods. Corp.*,

16

463 U.S. 60, 66–67, 103 S.Ct. 2875, 77 L.Ed.2d 469 (1983). . . . Our own precedent has alluded to yet another quality of commercial speech: whether the message is "placed in a commercial context and [is] directed at the providing of services rather than toward an exchange of ideas." *Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor & City Council of Balt.*, 721 F.3d 264, 286 (4th Cir. 2013) (quoting *Fargo Women's Health Org., Inc. v. Larson*, 381 N.W.2d 176 (N.D. 1986), *cert. denied*, 476 U.S. 1108, 106 S.Ct. 1957, 90 L.Ed.2d 365 (1986)).

*Handsome Brook Farm*, 700 F.App'x at 257–58.

In *De Simone*, the Fourth Circuit quoted *Handsome Brook Farm*, finding that:

Speech is more likely commercial when the declarant "hoped to realize an economic gain when disseminating its message." [*Handsome Brook Farm*, 700 F.App'x] at 258. "When a message communicates both commercial and noncommercial speech, it is treated like commercial speech unless the commercial and noncommercial messages are inextricably intertwined." [*Handsome Brook Farm*, 700 F.App'x] at 261 (cleaned up).

*De Simone*, 36 F.4th at 532.[4]

Plaintiff has alleged commercial speech under the detailed framework set out in *Handsome Brook Farm*, as well as under the framework set out in *De Simone*. Plaintiff asserts that Defendant's post was economically motivated because Plaintiff alleges that

---

[4] In *Riley v. National Federation of the Blind of North Carolina, Inc.*, 487 U.S. 781 (1988), the case cited in *Handsome Brook Farm*, the Court noted that where "the component parts of a single speech are inextricably intertwined, we cannot parcel out the speech, applying one test to one phrase and another test to another phrase." *Id.* at 796. Here, neither party analyzes whether the post contains both commercial and noncommercial speech, and whether those messages are inextricably intertwined.

"[a]dvertisement buyers pay Adalytics for information on ad technology vendors and publishers that improperly serve their advertisements." (ECF No. 9 ¶ 17).  Further, Plaintiff asserts that Defendant "hoped to realize an economic gain" because Plaintiff alleges that "Adalytics acknowledges that its posts are generated to advertise its services, stating: 'Like many other companies, we release thought leadership on systemic issues affecting             brands             and             their             media investments . . . to . . . attract new clientele.'" (ECF No. 9 ¶ 18).  Plaintiff also alleges that Defendant's "business thrives on creating distrust between advertiser buyers and advertising technology vendors and products. Adalytics is known for publishing inflammatory blog posts regarding advertising technology vendors and products for the purpose of winning new advertiser customers." (ECF No. 9 ¶ 19).

While Plaintiff does not contend that Defendant promotes a specific product in the post itself, Plaintiff alleges that the post serves as an advertisement for its product because Defendant posts "inflammatory blog posts regarding advertising technology vendors and products for the purpose of winning new advertiser customers." (ECF No. 9 ¶ 19).

Accordingly, at this motion to dismiss stage, Plaintiff has sufficiently alleged commercial speech.  Defendant does not argue that Plaintiff fails to allege the other elements of a commercial

advertisement; accordingly, Plaintiff has sufficiently alleged commercial advertisement.

**2. False Statements of Fact**

Plaintiff alleges that "[t]he post portrayed Colossus SSP as mis-declaring user IDs in its bid requests for the purpose of selling ad space at higher prices to ad buyers seeking to serve advertisements to a targeted audience." (ECF No. 9 ¶ 24). Plaintiff further alleges that:

> In the post, Adalytics purported to analyze and compare advertisements and bid responses on the Trade Desk DSP through 16 different SSPs, including Colossus SSP, in order to match the TDID declared by the SSP in its bid request and the actual cookie TDID stored in the user's browser. The post concluded that Colossus SSP is the only SSP for which there were consistent misdeclarations of user IDs—that is, the TDID declared by Colossus SSP in its bid request did not match the user's actual cookie TDID. The post further concluded that for the other fifteen SSPs, the TDID declared by the SSP "always perfectly" matched the user's actual cookie TDID.

(ECF No. 9 ¶ 25). Plaintiff alleges that these statements "are false and misleading." (ECF No. 9 ¶ 26). Plaintiff states that it "does not mis-declare or otherwise manipulate or alter user IDs in its bid requests." Plaintiff contends that

> it is not possible for Colossus SSP to mis-declare a user's TDID because Colossus SSP connects to Trade Desk through BidSwitch and has no control or knowledge of whether BidSwitch sends a particular bid request to Trade Desk or another DSP. And even if BidSwitch sends a bid request to Trade Desk, Colossus SSP has no knowledge of the TDIDs or the values associated with those TDIDs.

(ECF No. 9 ¶ 26).

Additionally, Plaintiff alleges that, while the post falsely stated that for the other fifteen SSPs, the TDIDs "'always perfectly' matched the user's actual cookie TDID," "there were discrepancies between the TDID sent in the bid response and the TDID in the user's browser for transactions between Trade Desk and other SSPs that connect to Trade Desk through an intermediary." (ECF No. 9 ¶¶ 27-28). Plaintiff alleges upon information and belief Defendant "doctored" a screenshot in its post to illustrate a lack of discrepancies for a different SSP. (ECF No. 9 ¶¶ 29-30).

Defendant argues that, taken in context of the full post, the statements were not false or misleading. (ECF No. 19-1, at 17-19). Defendant cites to multiple other parts of the post and correspondence with Plaintiff to show that, when viewed as a whole, the post does not accuse Plaintiff of intentionally misrepresenting user IDs. (ECF Nos. 19-1, at 17-19; 23, at 6-9). While Plaintiff also states that the post should be considered "in its entirety" (ECF No. 22, at 8), Plaintiff did not attach the post, and Plaintiff contends that there are several other versions of the post.

Defendant is attempting to pursue summary judgment at the motion to dismiss stage. At the motion to dismiss stage, the question is whether Plaintiff has plausibly alleged a false or

misleading statement in the complaint.  As set out above, Plaintiff has alleged that Defendant made a false or misleading statement in its post.

### 3. Injury

Plaintiff alleges that after Defendant shared an advanced copy of the post with the media on or about May 8 or 9, 2024, "on May 9, 2024, Trade Desk suspended business with Colossus SSP because of the post's claims that Colossus SSP misrepresented user IDs in its bid requests." (ECF No. 9 ¶ 43).  Additionally, several hours after Defendant published the post on May 10, 2024, BidSwitch suspended Plaintiff from its platform because of the claims in Defendant's post.  This caused Plaintiff "significant financial harm" because "the majority of Colossus SSP's revenue . . . comes from transactions through BidSwitch."  Lastly, Plaintiff alleges that in addition to the financial harm, Defendant's post has damaged Plaintiff's "reputation and goodwill by accusing Colossus SSP of engaging in fraudulent activity and impeaching Colossus SSP's honesty, integrity, and core business." (ECF No. 9 ¶¶ 44-45).

Defendant argues that Plaintiff has not sufficiently alleged that Plaintiff's injuries were proximately caused by Defendant's post.  (ECF No. 19, at 15).  Defendant cites one of the articles published on May 10, 2024, that reported that Trade Desk had known about the issues with Plaintiff for over a year.  Defendant further

quotes the article, seemingly to suggest that BidSwitch suspended relations with Plaintiff because Plaintiff implied BidSwitch was at fault for the mismatched user IDS. (ECF No. 19-1, at 16). Defendant also argues that despite Plaintiff's claim that Defendant's post has damaged Plaintiff's "reputation and goodwill by accusing Colossus SSP of engaging in fraudulent activity," the post did not accuse Plaintiff of fraudulent activity. (ECF No. 19-1, at 16). Lastly, Defendant argues that "any purportedly defamatory statements made by other publications should be addressed with those other publications." (ECF No. 19-1, at 16).

As discussed above, the court will not consider the article at this motion to dismiss stage. Moreover, Plaintiff has alleged that Defendant's post, and not just the other article, caused Plaintiff injury. Plaintiff alleged that Defendant gave the media a copy of the post prior to publishing it, and Trade Desk suspended business with Plaintiff on May 9, 2024, a day before the May 10, 2024, article was published. (ECF No. 9 ¶ 43). Therefore, at this stage, Plaintiff has sufficiently alleged that Defendant caused Plaintiff injury. Accordingly, Plaintiff has plausibly alleged a violation under the Lanham Act, and Defendant's motion to dismiss will be denied as to this claim.

### C. Count II: Defamation

Plaintiff alleges that Defendant's post was defamation under Maryland law. (ECF No. 9 ¶¶ 53-59). Plaintiff alleges that

Defendant "published false statements to the public, actual and prospective customers of Colossus SSP, and members of the industry." (ECF No. 9 ¶ 54). Plaintiff alleges that Defendant acted with "actual malice" because Defendant "knew that its statements were false and/or misleading based on its expertise in advertising technology and programmatic advertising" and because Plaintiff repeatedly informed Defendant that the post was false before Defendant published the post. (ECF No. 9 ¶ 58).

Plaintiff also alleges that "Adalytics' false, misleading, disparaging, and defamatory statements directly and proximately injured Colossus SSP, causing the loss of customers and industry partners and resulting in special damages, as well as the loss of good will and reputational injury." (ECF No. 9 ¶ 59).

Defendant argues that Plaintiff has failed to state a defamation claim under Maryland law because Plaintiff did not allege defamatory statements. (ECF No. 19-1, at 21). Additionally, Plaintiff failed to allege properly that Defendant had the required degree of fault to allege legal fault. (ECF No. 19-1, at 22).

This court has previously stated:

Under Maryland law, a properly pleaded defamation claim is accompanied by specific facts establishing the following four elements: "(1) that the defendant made a defamatory statement to a third person, (2) that the statement was false, (3) that the defendant was legally at fault in making the statement, and (4) that the plaintiff thereby suffered harm." *Piscatelli v. Van*

23

> *Smith*, 424 Md. 294, 306 (2012) (quoting *Indep.*
> *Newspapers, Inc. v. Brodie*, 407 Md. 415, 441 (2009)).

*Baker-Proctor v. PNC Bank, N.A.*, No. 21-CV-3299-DKC, 2023 WL
1801932, at *2 (D.Md. Feb. 7, 2023).  The parties dispute whether
Plaintiff has alleged the first and third elements.

> For purposes of the first element, a "defamatory
> statement" is one that tends to expose a person to
> "'public scorn, hatred, contempt, or ridicule,'" which,
> as a consequence, discourages "'others in the community
> from having a good opinion of, or associating with, that
> person.'" *Brodie*, 407 Md. at 441, 966 A.2d at 448
> (quoting *Offen* [*v. Brenner*], 402 Md. [191] [] 198-99,
> 935 A.2d [719,] 724 (2007)).

*Piscatelli*, 424 Md. at 306.

As discussed above, Plaintiff has alleged that Defendant made
"false and misleading" statements that damaged Plaintiff's
"reputation and goodwill."    Plaintiff alleged that the "[t]he
post portrayed Colossus SSP as mis-declaring user IDs in its bid
requests for the purpose of selling ad space at higher prices to
ad buyers seeking to serve advertisements to a targeted audience."
(ECF No. 9 ¶ 24).  Plaintiff has also alleged that Defendant's
post led to some of its business partners suspending their
relationships with Plaintiff, meaning "others in the community"
were discouraged from "associating with" Plaintiff.

To satisfy the element of legal fault, a plaintiff can allege
negligence or actual malice, alleging a defendant "published a
statement with actual knowledge of its falsity."   *Metro. Fin.*
*Servs. v. Vales*, No. 2005-CV-2330-DKC, 2005 WL 8174682, at *3

(D.Md. Nov. 14, 2005) (citing *Samuels v. Tschechtelin*, 135 Md.App. 483, 544 (2000)).  Plaintiff has sufficiently alleged actual knowledge because Plaintiff alleged that Defendant "knew that its statements were false and/or misleading based on its expertise in advertising technology and programmatic advertising" and because Plaintiff repeatedly informed Defendant that the post was false before Defendant published the post.  (ECF No. 9 ¶ 58). Accordingly, Plaintiff has sufficiently alleged a defamation claim under Maryland law, and Defendant's motion to dismiss will be denied as to this claim.

### D. Count III: Injurious Falsehood

Plaintiff alleges that Defendant's post was injurious falsehood because Defendant "published false, misleading, and disparaging statements about Colossus SSP's business to the public, actual and prospective customers of Colossus SSP, and members of the industry." (ECF No. 9 ¶ 61).  Plaintiff alleges that Defendant acted with "actual malice" because Defendant "knew that its statements were false and/or misleading based on its expertise in advertising technology and programmatic advertising" and because Plaintiff repeatedly informed Defendant that the post was false before Defendant published the post. (ECF No. 9 ¶ 58).

Defendant argues that Plaintiff has not adequately pled actual malice and special damages. (ECF No. 19-1, at 25-27).

"To maintain a claim for injurious falsehood, the plaintiff must establish that the defendant acted with malice in publishing to a third party a known falsity that caused special damages." *Redmonds Enter., Inc. v. CSX Transp., Inc.*, No. 16-CV-3943-CCB, 2017 WL 2335598, at *4–5 (D.Md. May 30, 2017) (citing *Nat'l Bd. for Certification in Occupational Therapy, Inc. v. Am. Occupational Therapy Ass'n*, 24 F.Supp.2d 494, 511 (D.Md. 1998)). "A plaintiff has pled special damages where it asserts the loss of a present or prospective advantage." *Redmonds Enter., Inc.*, No. 2017 WL 2335598, at *5 (citing *Nat'l Bd.*, 24 F.Supp.2d at 511). Under Fed. R. Civ. P. 9(g), "[i]f an item of special damage is claimed, it must be specifically stated."

As discussed above, Plaintiff has alleged Defendant acted with malice in publishing a known falsity because Plaintiff alleged Defendant knew the statements in the post were false. Additionally, Plaintiff has pled special damages because Plaintiff alleged that Trade Desk and BidSwitch suspended relationships with Plaintiff after the post was published. At this stage, Plaintiff has sufficiently alleged injurious falsehood, and Defendant's motion to dismiss will be denied as to this claim.

## IV.  Conclusion

For the foregoing reasons, Defendant's motion to dismiss will be denied.  A separate order will follow.


_____/s/_____
DEBORAH K. CHASANOW
United States District Judge