**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

---

COLOSSUS MEDIA, LLC

     *Plaintiff*

v.

ADALYTICS RESEARCH, LLC

     *Defendant*

Case 8:24-cv-01402-PX

---

**DEFENDANT ADALYTICS RESEARCH, LLC'S**
**ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIM**

Defendant Adalytics Research, LLC ("<u>Adalytics</u>" or "<u>Defendant</u>"), by and through its undersigned attorneys, hereby files its Answer, Affirmative Defenses, and Counterclaim to the Amended Complaint filed by Plaintiff Colossus Media, LLC ("<u>Colossus</u>" or "<u>Plaintiff</u>"). Adalytics states as follows:

**<u>ADALYTICS' ANSWER</u>**

**INTRODUCTION**

1.     Adalytics lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the first four sentences of Paragraph 1 of Plaintiff's Amended Complaint. Adalytics admits it is a "for-profit company" that offers a transparency platform to allow advertisers to protect their media investments; that it began disseminating an advance copy of a report regarding Colossus ("<u>Report</u>") to some journalists on or about May 8, 2024; and that it declined to share its full Report with Plaintiff or speak to representatives of Plaintiff on the telephone prior to publication of the Report. Adalytics denies the remaining allegations in Paragraph 1 of Plaintiff's Amended Complaint and, by way of further answer, states that its May

10, 2024 Report about Colossus correctly reported its observations about user ID mismatches in a sample of observed ad impressions.

## THE PARTIES

2.      Adalytics lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 2 of Plaintiff's Amended Complaint.

3.      Admitted.

## JURISDICTION AND VENUE

4.      Paragraph 4 of Plaintiff's Amended Complaint contains a legal conclusion to which no response is required.

5.      Paragraph 5 of Plaintiff's Amended Complaint contains a legal conclusion to which no response is required.

6.      Paragraph 6 of Plaintiff's Amended Complaint contains a legal conclusion to which no response is required.

7.      Paragraph 7 of Plaintiff's Amended Complaint contains a legal conclusion to which no response is required.

8.      Paragraph 8 of Plaintiff's Amended Complaint contains a legal conclusion to which no response is required.

## FACTUAL BACKGROUND

### A.  Colossus and Its Business

9.      Adalytics lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 9 of Plaintiff's Amended Complaint.

10.     Adalytics lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 10 of Plaintiff's Amended Complaint.

11.     Adalytics lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of Paragraph 11 of Plaintiff's Amended Complaint. Adalytics admits the general statements about the digital advertising industry in Paragraph 11 of Plaintiff's Amended Complaint.  Adalytics denies the remaining allegations in Paragraph 11 of Plaintiff's Amended Complaint.

12.     Adalytics denies the allegations in the first sentence of Paragraph 12 of Plaintiff's Amended Complaint.  Adalytics admits the general statements about the theoretical functions of sell-side platforms ("SSPs") and demand-side platforms ("DSPs") in Paragraph 12 of Plaintiff's Amended Complaint.  Adalytics denies the remaining allegations in Paragraph 12 of Plaintiff's Amended Complaint.

13.     Adalytics admits the allegations in the first sentence of Paragraph 13 of Plaintiff's Amended Complaint.  Adalytics lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the second sentence of Paragraph 13 of Plaintiff's Amended Complaint.

14.     Adalytics admits Plaintiff is indirectly integrated with The Trade Desk DSP through the middleware provider BidSwitch, a subsidiary of Criteo.  Adalytics denies the remainder of the allegations in Paragraph 14 of Plaintiff's Amended Complaint.

15.     Adalytics lacks knowledge or information sufficient to form a belief as to the truth of the allegation that an unidentified "third-party expert" made the quoted statement.  Adalytics denies that the quoted statement is correct.  Adalytics denies the remainder of the allegations in Paragraph 15 of Plaintiff's Amended Complaint.

**B. Adalytics and Its False, Defamatory, and Disparaging Blog Post**

16.     Adalytics admits it is a for-profit company and states that it in fact conducts advertising analytics to serve brands and advertisement buyers.  Adalytics admits the allegation in the second sentence of Paragraph 16 of Plaintiff's Amended Complaint.

17.     Adalytics admits the allegations in Paragraph 17 of Plaintiff's Amended Complaint except for the qualifying language "so-called."  Such language is denied, and Adalytics further states that it provides advertisers with transparency and data analytics so that they may understand which ad placements are properly, as well as improperly, served.

18.     Adalytics denies the allegations in Paragraph 18 of Plaintiff's Amended Complaint. Adalytics further states that none of its blog posts over the last three years has proposed or suggested or solicited a commercial transaction and that each such post provides a "free" solution to the problem described.

19.     Adalytics denies the allegations in Paragraph 19 of Plaintiff's Amended Complaint.

20.     Adalytics admits several reporters contacted Colossus in early May 2024 regarding an advance copy of an Adalytics blog post.  Adalytics denies the remaining allegations in Paragraph 20 of Plaintiff's Amended Complaint.

21.     Adalytics admits that Plaintiff contacted it and asked for a full advance copy of its Report and that Adalytics declined the request.  Adalytics denies the remaining allegations in Paragraph 21 of Plaintiff's Amended Complaint.  By way of further answer, Adalytics states that it offered to consider any persuasive "facts and information" that showed its Report was "false," but Plaintiff provided none.  In particular, Plaintiff sent a letter to Adalytics with screenshots supposedly illustrating the Plaintiff's assertions and the statement: "HAR files can be provided

upon request." Adalytics offered on three separate occasions to update its Report upon receipt and validation of the referenced HAR files, but Plaintiff never provided such files to Adalytics.[1]

22.    Adalytics admits it declined to provide an advance copy of its Report to Plaintiff or Plaintiff's parent company prior to publishing the Report, and Adalytics admits it declined to participate in a phone call. Adalytics denies the remaining allegations in Paragraph 22 of Plaintiff's Amended Complaint.

23.    Adalytics admits it published the Report titled "Are user IDs declared consistently in ad auctions?" on its website on May 10, 2024. Adalytics denies the remaining allegations in Paragraph 23 of Plaintiff's Amended Complaint.

24.    Adalytics denies the allegations in Paragraph 24 of Plaintiff's Amended Complaint.

25.    Adalytics admits the allegations in Paragraph 25 of Plaintiff's Amended Complaint except for the qualifying language "purported" in the first sentence. Such language is denied.

26.    Adalytics denies the allegations in Paragraph 26 of Plaintiff's Amended Complaint.

27.    Adalytics admits that its Report acknowledged that Plaintiff is integrated with The Trade Desk through the services of BidSwitch. Adalytics denies the remainder of the allegations in Paragraph 27 of Plaintiff's Amended Complaint. By way of further answer, Adalytics states that it studied all publicly available technical documentation from BidSwitch and Colossus and could find nothing that would indicate that BidSwitch's technology was responsible for mis-declared TDIDs. In addition, Adalytics notes that Ryan Damon, general counsel for Criteo, BidSwithch's parent company, provided the following statement to The Drum for an article that

---

[1] A HAR file is a type of network recording, which contains relevant digital forensics about ads being served to a given consumer's browser.

can be found at https://www.thedrum.com/news/2024/05/10/supply-side-provider-colossus-accused-misrepresenting-user-ids-ad-auctions:

> "BidSwitch operates as a neutral 'passthrough' platform, sending traffic from SSPs to DSPs without manipulating the content of bid requests from SSPs or bid responses from DSPs. … BidSwitch has been doing this for over 11 years with hundreds of partners throughout the industry, including the very largest. Any claims or implications by Colossus SSP that BidSwitch is to blame for Colossus SSP's manipulation of the content of bid requests are untrue and we encourage all parties to investigate further into the merits of any such statements before publishing untrue statements."

Damon Statement from The Drum article.

28.     Adalytics denies the allegations in Paragraph 28 of Plaintiff's Amended Complaint. By way of further answer, Plaintiff reliably and accurately reported what it observed.

29.     Adalytics admits the allegations in Paragraph 29 of Plaintiff's Amended Complaint except for the qualifying language "purports" in the first sentence. Such language is denied.

30.     Adalytics denies the allegations in Paragraph 30 of Plaintiff's Amended Complaint.

31.     Adalytics denies the allegations in Paragraph 31 of Plaintiff's Amended Complaint.

32.     Adalytics admits that the quoted text in Paragraph 32 of Plaintiff's Amended Complaint appears in its Report. Adalytics denies it made any "false statements" and states that the quoted text is a definition composed by the Media Rating Council and not Adalytics. Adalytics denies the remaining allegations in Paragraph 32 of Plaintiff's Amended Complaint.

33.     Adalytics denies the allegations in Paragraph 33 of Plaintiff's Amended Complaint.

34.     Adalytics denies the allegations in Paragraph 34 of Plaintiff's Amended Complaint.

35.     Adalytics admits it provided an advance copy of its Report to certain media members in advance of publishing. Adalytics also admits it declined to provide an advance copy to Plaintiff and declined to participate in a phone call. Adalytics denies the remaining allegations in Paragraph 35 of Plaintiff's Amended Complaint.

36.    Adalytics admits media outlets authored published articles about Adalytics' Report and that such media outlets used additional sources in their articles.  Adalytics denies the remaining allegations in Paragraph 36 of Plaintiff's Amended Complaint.

37.    Paragraph 37 of Plaintiff's Amended Complaint contains references to an article by AdExchanger, the contents of which speak for themselves.  Adalytics lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the second sentence of Paragraph 37 of Plaintiff's Amended Complaint.  Adalytics denies the remaining allegations in Paragraph 37 of Plaintiff's Amended Complaint.

38.    Paragraph 38 of Plaintiff's Amended Complaint contains a reference to an article by AdExchanger, the contents of which speak for themselves.  Adalytics lacks knowledge or information sufficient to form a belief as to how AdExchanger interpreted Adalytics' Report in conjunction with the other sources that the author of the article interviewed.  Adalytics denies the remaining allegations in Paragraph 38 of Plaintiff's Amended Complaint.

39.    Adalytics admits articles in addition to AdExchanger's have been published about Adalytics' report, including one by The Drum, which relied upon multiple sources of information.  Adalytics denies the remaining allegations in Paragraph 39 of Plaintiff's Amended Complaint.

40.    Adalytics denies the allegations in Paragraph 40 of Plaintiff's Amended Complaint.

41.    Adalytics denies the allegations in Paragraph 41 of Plaintiff's Amended Complaint.

**C.  Adalytics' False Blog Post Has Directly Harmed Colossus SSP.**

42.    Adalytics denies the allegations in Paragraph 42 of Plaintiff's Amended Complaint.

43.    Adalytics lacks knowledge or information sufficient to form a belief as to whether The Trade Desk suspended business with Colossus during the times referenced.  Colossus has never stated as much to the SEC and investing public, and in statements to the SEC has directly

contradicted the information in Paragraph 43 of its Amended Complaint.  Colossus' parent corporation, direct Digital Holdings, Inc., told the SEC and the public via its October 22, 2024 Form S-1 prospectus that "Colossus SSP is integrated into several leading DSPs including but not limited to The Trade Desk … ."  Furthermore, on Colossus' public-facing website as of March 11, 2025 (archived: https://perma.cc/JC6W-JQ2U), Colossus still claimed to prospective customers and investors that The Trade Desk was a DSP partner with which Colossus worked, and it prominently featured The Trade Desk logo.  Adalytics denies the remaining allegations in Paragraph 43 of Plaintiff's Amended Complaint.

44.    Adalytics admits BidSwitch suspended Colossus for a time.  Adalytics denies the remaining allegations in Paragraph 44 of Plaintiff's Amended Complaint.

45.    Adalytics denies the allegations in Paragraph 45 of Plaintiff's Amended Complaint.

## CAUSES OF ACTION

### Count I: Federal False Advertising and Unfair Competition (15 U.S.C. § 1125(a))

46.    Adalytics adopts by reference each and every one of the foregoing responses as if alleged in full in response to Count I, except as they may be inconsistent with its specific responses to the allegations contained in Count I.

47.    Adalytics denies the allegations in Paragraph 47 of Plaintiff's Amended Complaint.

48.    Adalytics denies the allegations in Paragraph 48 of Plaintiff's Amended Complaint.

49.    Adalytics denies the allegations in Paragraph 49 of Plaintiff's Amended Complaint.

50.    Adalytics denies the allegations in Paragraph 50 of Plaintiff's Amended Complaint.

51.    Adalytics denies the allegations in Paragraph 51 of Plaintiff's Amended Complaint.

52.    Adalytics denies the allegations in Paragraph 52 of Plaintiff's Amended Complaint.

**Count II: Defamation (Maryland Law)**

53.     Adalytics adopts by reference each and every one of the foregoing responses as if alleged in full in response to Count II, except as they may be inconsistent with its specific responses to the allegations contained in Count II.

54.     Adalytics denies the allegations in Paragraph 54 of Plaintiff's Amended Complaint.

55.     Adalytics denies the allegations in Paragraph 55 of Plaintiff's Amended Complaint.

56.     Adalytics denies the allegations in Paragraph 56 of Plaintiff's Amended Complaint.

57.     Adalytics denies the allegations in Paragraph 57 of Plaintiff's Amended Complaint.

58.     Adalytics denies the allegations in Paragraph 58 of Plaintiff's Amended Complaint.

59.     Adalytics denies the allegations in Paragraph 59 of Plaintiff's Amended Complaint.

**Count III: Injurious Falsehood (Maryland Law)**

60.     Adalytics adopts by reference each and every one of the foregoing responses as if alleged in full in response to Count III, except as they may be inconsistent with its specific responses to the allegations contained in Count III.

61.     Adalytics denies the allegations in Paragraph 61 of Plaintiff's Amended Complaint.

62.     Adalytics denies the allegations in Paragraph 62 of Plaintiff's Amended Complaint.

63.     Adalytics denies the allegations in Paragraph 63 of Plaintiff's Amended Complaint.

64.     Adalytics denies the allegations in Paragraph 64 of Plaintiff's Amended Complaint.

65.     Adalytics denies the allegations in Paragraph 65 of Plaintiff's Amended Complaint.

Adalytics denies Plaintiff is entitled to any of the relief it seeks in its Prayer for Relief. Adalytics further states that any of Plaintiff's allegations that were not expressly admitted are denied.

WHEREFORE, Defendant respectfully requests this Court (a) enter judgment in favor of Defendant and against Plaintiff; (b) grant Defendant its reasonable attorneys' fees and costs; and (c) award Defendant such other and further relief as the Court deems just and proper.

## <u>ADALYTICS' AFFIRMATIVE DEFENSES</u>

### First Affirmative Defense

Plaintiff fails to state a cause of action upon which relief can be granted.

### Second Affirmative Defense

Plaintiff's claims should be dismissed based upon Maryland's Anti-SLAPP law, codified at Md. Code, Cts. & Jud. Proc. § 5-807.  Plaintiff brought its lawsuit in bad faith against Adalytics, which had reported on matters of public concern, to inhibit Adalytics' exercise of rights under the First Amendment of the U.S. Constitution.

### Third Affirmative Defense

Plaintiff's claims are barred, in whole or in part, by the doctrine of unclean hands.

### Fourth Affirmative Defense

Plaintiff's claims are barred, in whole or in part, by equitable estoppel.

### Fifth Affirmative Defense

Plaintiff's claims are barred, in whole or in part, by fraud.

### Sixth Affirmative Defense

Plaintiff's claims are barred, in whole or in part, by waiver.

### Seventh Affirmative Defense

Plaintiff's claims are barred, in whole or in part, because neither The Trade Desk nor BidSwitch made any decision on whether to suspend Plaintiff for any reason other than those firms' long-term experiences with Plaintiff and the firms' own comprehensive internal analyses as to

whether Plaintiff's advertising transactions were consistent with those firms' policies and expectations.  The Trade Desk and BidSwitch both employ teams of digital advertising technology and data science experts, as well as internal legal, public relations, and digital ad inventory experts.  These companies do not make decisions regarding their SSP partners solely based on public interest research reports written by Adalytics – a company with which they had no contractual relationships when the Report was published.  Potential and existing customers of Plaintiff are sophisticated companies that routinely make operating decisions without any input from Adalytics and would not be deceived by any false information (even if Adalytics had published false information, which it did not).

Adalytics intends to rely upon any and all other affirmative defenses to Plaintiff's Amended Complaint that may become available through the course of discovery in this case and hereby reserves the right to amend this Answer to include any such defenses.

## ADALYTICS' COUNTERCLAIM

### PRELIMINARY STATEMENT

1.     Adalytics Research, LLC ("Adalytics" or "Defendant" or "Counter-Plaintiff") conducts advertising analytics, providing digital forensics to media buyers and advertisers in the digital advertising industry.

2.     To its clients, Adalytics provides virtually real-time insight as to where the advertising dollars they spend are being deployed.  For example, if most of an advertiser's advertising dollars are going to ads that are displayed in the middle of the night, Adalytics will call attention to this so that a correction can be made.  Similarly, if a vendor is not following the advertiser's instructions (for example, not abiding by a cap on how often an ad is shown to the

same user), Adalytics will identify the vendor and advise the client on how to correct the issue or obtain rebates.

3.    In addition, from time to time, Adalytics will publish reports regarding matters that it considers to be of public interest with no expectation of commercial or financial gain.  Many of Adalytics' reports simply document empirical research observations, which other industry participants and/or journalists investigate with additional, independent sources of information. Adalytics' reports generally do not instruct or recommend to ad industry participants that they do anything but check their own records and make their own informed decisions based upon their own data.

4.    One of Adalytics' reports, titled "Are user IDs declared consistently in ad auctions?" was published on May 10, 2024 (hereinafter, "Report").  The Report was based upon a study of the source code of a sample of ads and bid responses served by The Trade Desk (a demand side platform) on behalf of different advertisers and on different publisher properties.

5.    The study looked at bid responses transacted by The Trade Desk through 16 sell-side platforms, including Colossus Media, LLC ("Colossus" or "Plaintiff" or "Counter-Defendant"), on numerous websites.  Among the observations Adalytics made was that in its sample data, for Colossus only, the user ID declared to The Trade Desk at the time of an ad auction appeared – multiple times – to be different from the actual, persistent user ID stored in the user's browser cookie storage, wherein that cookie had been present for days or weeks.

6.    Adalytics based its Report on publicly available information and did not alter or change any of such information.  Adalytics' work, therefore, could be independently verified or reproduced.

7.      Shortly after Adalytics released the Report, other publications published articles based upon Adalytics' observations as well as independent sources of information, such as analyses conducted by sophisticated, independent third parties, and interviews with industry participants with knowledge of the matter being reported.

8.      While Adalytics' Report and all of the allegations therein were based upon facts and were entirely accurate, Colossus denied the assertions of fact in the Report.[2]

9.      Rather than attack the assertions with explanations and factual assertions of its own, however, Colossus ran to this Court to file the instant lawsuit.  Upon information and belief, Colossus filed its complaint in bad faith and for the purpose of chilling Adalytics' rights to publish information of interest to the public.[3]

10.     In addition, after learning of the Report, Colossus began making defamatory statements to clients and potential clients of Adalytics.

11.     Upon information and belief, Colossus told Adalytics' advertiser clients and potential clients that Adalytics' Report was "false" and "inaccurate" and part of some kind of conspiracy or "concerted action" against Plaintiff.  Colossus has made these libelous and

---

[2] Upon information and belief, Plaintiff had been warned multiple times about its lack of conformity with The Trade Desk's ad inventory and transaction rules before Adalytics published the Report.  In addition, upon information and belief, The Trade Desk had restricted Colossus' ad auction activity prior to Adalytics publishing the Report.

[3] Colossus and its parent company, Direct Digital Holdings, Inc. ("DRCT"), appeared to use a similar tactic in late 2023 when a market research firm called White Diamond Research, owned by Adam Gefvert, released a report titled, "A Mountain of Evidence Suggests That Much of DRCT Holdings Revenue May be Fake and Is Hiding Its Uncollectible Accounts Receivable – 90+% Downside."  DRCT filed suit against White Diamond in the U.S. District Court for the Southern District of Texas (*Direct Digital Holdings, Inc. v. White Diamond Research, LLC, et al.*, Civil Action No. 4:23-cv-4641), bringing some of the same causes of action Colossus brought against Adalytics in the instant case (including Federal False Advertising and Unfair Competition (15 U.S.C. § 1125(a)) and state-law defamation).  DRCT filed an agreed motion to dismiss the case on Dec. 22, 2023.

slanderous statements in SEC financial statements and conference calls since it filed its present meritless complaint.

12.     Such statements were entirely false, and Colossus knew they were false. Nevertheless, Colossus made the statements with the intention of harming Adalytics.

13.     Since the publication of the Report, Adalytics has uncovered additional information that: supports the truthfulness of its Report; indicates that Colossus filed its lawsuit to silence Adalytics; and shows that Colossus' communications to Adalytics' clients were made in bad faith and intended to harm Adalytics.

14.     Adalytics, therefore, brings this Counterclaim seeking damages against Colossus for its defamatory statements.

## PARTIES

15.     Defendant / Counter-Plaintiff Adalytics, LLC is a Maryland limited liability company.

16.     Plaintiff / Counter-Defendant Colossus Media, LLC is a Delaware limited liability company.  Colossus does business and is headquartered in Texas.

## JURISDICTION AND VENUE

17.     This Court has jurisdiction over the Complaint filed by Colossus in this action pursuant to 28 U.S.C. § 1332(a)(1).  The causes of action alleged herein are so related to the Complaint that they form the same case or controversy under Article III of the U.S. Constitution, pursuant to 28 U.S.C. § 1367.

18.     Venue is proper pursuant to 28 U.S.C. § 1391.

## FACTUAL ALLEGATIONS

### A. Colossus' Business and Exponential Growth

19.    Direct Digital Holdings, Inc. ("DRCT") acquired Colossus in 2018.  Colossus is what is known as a sell-side platform ("SSP") that interacts with media publishers, other ad tech intermediaries, and demand-side platforms ("DSPs") to help provide relevant ads to specific audiences.

20.    Essentially, Colossus receives information about a person visiting a website or other platform and then sends a request for bids on the ad space available on the website or platform the person is visiting to ad tech intermediaries and demand-side platforms.  Colossus sends the request for bids – either directly or through an intermediary – by matching the person's cookie ID with an intermediary's user ID and/or with a demand-side platform user ID within the parameters of the demand-side platform's targeted audience.  In other words, the ad space available on websites and platforms is for sale; sell-side platforms like Colossus and partners attempt to match the visitors of the sites with advertisers in which the visitors might be interested.

21.    A helpful explanation of this process comes directly from the Report, a copy of which is attached hereto as **Exhibit 1**:

> In programmatic advertising, vendors utilize user IDs to build audience profiles and decide how to serve targeted ads.  For example, a user with a given user ID might frequent a lot of gardening websites, and consequently, when ad tech vendors "see" that specific user ID, the vendors serve ads to that user ID from advertisers who are promoting gardening tools.

> Some user IDs can elicit higher bids from ad tech vendors on behalf of media buyers.  For example, a user ID that is thought to be associated with a doctor may elicit very high bid prices from DSPs.

Report, p. 1.

22.     According to the 2021 SEC 10K report for Colossus' parent company, DRCT, in 2020, Colossus had $2.8 million in revenue.  In the first quarter of 2021, Colossus had about $850,000 in sales, but for all of 2021, it had $12 million in revenue.  Given Colossus had quadrupled its year-over-year revenue, something dramatic clearly had happened in the later quarters of 2021.

23.     By the end of 2022, Colossus' revenues were $60 million, and for 2023, they were $122.4 million.  In the third quarter of 2023 alone, DRCT reported $51.5 million in revenue.

24.     Considering revenue in this industry typically is a flat percentage of placement revenue, Colossus clearly had found a way to increase sale volume / auction success, and a way of making each transaction more profitable.

**B.  Colossus Increases Revenue**

25.     As Adalytics has learned through research of publicly available data, Colossus' exponential growth was due to consistent disregard of DSP and publisher ad server rules; in other words, deceptive and even fraudulent techniques.

26.     First, as can be gleaned from publicly available internet archive files, Colossus' increase in revenue was due at least in part to violating the terms of partners' (such as The Trade Desk's) ad inventory policies and rules.  Specifically, Colossus declared its ad auctions on websites using the Google Ad Manager ("GAM") publisher ad server to be "Second Price Auctions" despite the fact that GAM had switched exclusively to a "First Price Auctions" model during 2019.

27.     A First Price Auction is what most would consider to be an "auction" – in other words, in a First Price Auction, the advertiser that bids the highest amount wins and pays the price it bid.  In a Second Price Auction, on the other hand, the highest bidder still wins but pays ***only the price of the second-highest bid***.

28.    By mis-declaring First Price Auctions as Second Price Auctions, Colossus was able to "trick" The Trade Desk's algorithms to avoid leveraging a tactic called "bid shading" that is commonly used in First Price Auctions and thus caused The Trade Desk and its advertiser clients to over-bid and over-pay for ad inventory on various websites.

29.    As a theoretical example, if a publisher website runs a First Price Auction, and two prospective media buyers submit $20 and $10 bids, the $20 bid wins, and the advertiser pays $20 for the ad slot.  In this case, demand side platforms use specially calibrated algorithms that perform "bid shading" to try to accurately predict the minimum bid needed to successfully win the First Price Auction.  In a Second Price Auction, two prospective media buyers submit $20 and $10 bids, and the first media buyer wins and then pays a price-reduced final amount of $10 plus one cent ($10.01).  DSPs often do not use their bid shading algorithms in Second Price Auctions, as the DSP and their advertiser clients expect their bid to be price reduced.  However, if an ad exchange mis-declares a First Price Auction as a Second Price Auction, this can "trick" a demand side platform such as The Trade Desk not to bid shade and place a higher bid than it would have if it knew the Auction was actually a First Price Auction.  Such would cause The Trade Desk and its advertiser clients to pay more than they would have for ad inventory transacted by Colossus.

30.    The second way Colossus could increase its revenues was by mis-declaring user IDs in auctions, as was described in the Report that is at the center of this lawsuit.

31.    Colossus is a sell-side platform that interacts with media publishers, other intermediaries, and demand-side platforms to facilitate ad auctions and help serve ads to the visitors of websites and apps.  Boiled down to its essence, Colossus is essentially an on-line matchmaker that helps websites auction off advertising space by connecting website visitors with relevant advertisers.  When a visitor browses a website, Colossus gathers some data and sends a

bid request for the ad space on that website to a demand side platform. The demand side platform (either directly or through an intermediary) then bids on the ad space on behalf of a brand.

32.     In April of 2024, Adalytics noticed discrepancies in auctions involving Colossus. Specifically, in those auctions involving Colossus, the "buyer user ID" field **did not consistently** match the buyer user ID provided by the DSP in advance of an ad auction.

33.     The buyer user ID corresponds to a "cookie" placed in the user's browser by the DSP and contains information volunteered by the user, or inferred by the DSP, over many interactions with the user. By way of example, a manufacturer of dentures is less likely to purchase an ad placement if it knows the user is between the ages of 18 and 30.

34.     The buyer user IDs submitted in ad auctions involving Colossus – though they did not match – were actual buyer user IDs, not random numbers. Such is significant because these auctions involved **real user IDs** (likely representing high-value customers). Re-using high value cookie IDs leads to more revenue because they would win more auctions and at higher prices.

35.     Adalytics observed the mis-matched buyer user IDs in publicly obtainable data.

36.     Furthermore, Colossus was seen serving ads from The Trade Desk and its advertiser clients to easy-to-identify, well-known "bots" since December 2021. Bot traffic is considered "invalid traffic," and ads served to invalid traffic are not compensable under industry rules.[4]

---

[4] Notably, Colossus had made or continues to make multiple misrepresentations to its prospective customers that it works with other sophisticated entities in order gain customers' trust. Colossus has falsely claimed to partner with various demand side platforms or certain publishers that it has not had any relationship with at that time. For example, as of April 2025, Colossus continues to display the Oracle Moat logo on its website as one of its partners. Oracle Moat has been defunct since approximately September 2024, as Oracle closed down this subsidiary at that time. Furthermore, Colossus claims on its public-facing website that it transacts "Brand-Safe" ad inventory from "trusted" or "premium publishers." However, Colossus has been observed serving ads on low-quality, possibly illegal-content-containing websites, as well as likely counterfeit connected TV (CTV) inventory.

### C.  The Fallout

37.     Upon information and belief, in late November 2023, Google's DV360 DSP took action against Colossus for noncompliance with its rules for, *inter alia*, submitting false buyer user IDs.

38.     As a consequence of Colossus' actions, Google "clawed back" almost $9 million in revenue (according to DRCT's revised 10K for 2023, filed with the SEC on October 15, 2024) that its advertisers had paid for nonconforming inventory by refusing to pay Colossus for ads placed on this inventory.

39.     In March of 2024, stock market analysts following DRCT expected it to report $66 million in revenues for the fourth quarter of 2023.  Instead, it reported approximately $41 million.

40.     Adalytics published its Report on May 10, 2024.

41.     Shortly thereafter, Colossus filed suit and, on June 3, 2024, filed its operative Amended Complaint.

42.     Colossus took aim at Adalytics not just through legal action.  After learning of the Report, upon information and belief, Colossus began making defamatory statements to clients and potential clients of Adalytics, including stating that the Report was "false" and "inaccurate" and part of some kind of conspiracy or "concerted action" against Plaintiff.

43.     Such statements were entirely false, and Colossus knew they were false. Nevertheless, Colossus made the statements with the intention of harming Adalytics.

### COUNTERCLAIM I
### Defamation

44.     Adalytics adopts by reference each and every one of the foregoing factual allegations as if alleged in full, except as they may be inconsistent with the specific allegations contained herein.

45.     On May 10, 2024, after Colossus learned of The Trade Desk's concerns – and the imminent publishing of the Report – Colossus began sending targeted emails to specific advertisers who were clients or potential clients of Adalytics.

46.     In these emails, Colossus deliberately spread false information about Adalytics. Upon information and belief, Colossus labeled Adalytics' Report as "false" and "inaccurate," and claimed that Adalytics was part of some conspiracy or "concerted action" against Colossus.

47.     Such claims were defamatory, in that they exposed Adalytics to public contempt and ridicule because they portrayed Adalytics as a rogue organization that was attempting to disparage another company to increase its own standing with clients and potential clients. Colossus' statements about Adalytics were intended to discourage those to whom the statements were made from having a good opinion of Adalytics.

48.     Moreover, the statements were false.  Adalytics based its Report on information that was publicly available and that Adalytics did not alter in any meaningful way.  Adalytics' work, therefore, could be independently verified.

49.     In addition, upon information and belief, The Trade Desk suspended Colossus from access to the vast number of ordinary ad buyers on its platform not because of Adalytics' Report but because of Colossus' consistent failure to observe platform rules (providing nonconforming inventory, mismatched buyer user IDs, and mis-declaring auction price types).  According to numerous news reports, including an article by AdExchanger, The Trade Desk discovered the problems with Colossus more than a year before Adalytics' Report and had given Colossus ample time to cure the issues.  Around May 9 or 10, near or shortly after Adalytics' May 10, 2024 blog post, The Trade Desk would suspend Colossus completely from its platform.

50.     In addition, Colossus sent Adalytics a letter on May 10, 2024, and therein it did not deny that TDID mismatches were occurring in ad auctions involving Colossus.

51.     Despite knowing Adalytics' Report was accurate, therefore, Colossus made its defamatory statements.

52.     Given the above, Colossus was, at a minimum, acting negligently in making defamatory statements about Adalytics.  More likely, Colossus made the statements ***knowing*** they were false, as Colossus was aware that it had been suspended for a time by The Trade Desk and that millions of dollars it had collected had been clawed back based upon its improper actions.

53.     Of note, a May 16, 2024 article by ad industry trade publication Digiday included the following:

> [A]cross the board, some ad tech vendors have stopped dealing with Colossus as a marketplace altogether.  "We've stopped buying from Colossus," said an ad tech [executive], who asked to remain anonymous due to commercial sensitivities. Their decision, ***made independently from the Adalytics report***, was based on their own testing, which ultimately led them to the same conclusion.  The results are outlined here, but the main takeaway is this: ID mismatches are not unique to Colossus; they are actually quite common across various ad tech vendors. However, the specific problem with Colossus is that the user IDs never matched, setting it apart from other vendors.  The same goes for a publisher, who also spoke to Digiday on condition of anonymity.  But it wasn't just the Adalytics report that put them off selling ads through the Colossus programmatic marketplace.  It was also its financial standings.[5]

54.     As a result of Colossus' defamatory statements, Adalytics has suffered harm, including losing clients and potential clients.

WHEREFORE, Counterclaim Plaintiff Adalytics Research, LLC hereby requests this Court (1) enter judgment in its favor against Colossus Media, LLC, (2) award damages in an amount to be determined at trial; (3) order Colossus Media, LLC to pay to Adalytics Research,

---

[5] https://digiday.com/marketing/ad-tech-vendor-colossus-faces-scrutiny-for-alleged-mismanaging-ids/) (emphasis added).

LLC its attorneys' fees, expenses, and costs expended in this litigation; and (4) grant such other and further relief as is just and proper.

Dated: April 2, 2025                            Respectfully submitted,

                                               **SCHULMAN BHATTACHARYA, LLC**

                                    By:    */s/ Koushik Bhattacharya*
                                               Koushik Bhattacharya
                                               James "Jake" Schaller
                                               6116 Executive Boulevard, Suite 425
                                               North Bethesda, Maryland 20852
                                               Tel: (240) 356-8550
                                               Facsimile: (240) 356-8558
                                               Email: kbhattacharya@schulmanbh.com
                                                        jschaller@schulmanbh.com

                                               *Counsel for Defendant Adalytics Research, LLC*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 2nd day of April, 2025, a copy of the was served on all counsel of record via CM/ECF.

                                               */s/ Koushik Bhattacharya*
                                               Koushik Bhattacharya